FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

97 JAN -6  PM 1: 16

U.S. DISTRICT COURT
N.D. OF ALABAMA

FRAN MILLER, LAURA MILLER                )
and APRYL JENNINGS,                      )
                                         )
          Plaintiffs,                    )
                                         )
v.                                       )          CV-95-PT-3263-S
                                         )
QUALITY OF LIFE HEALTH                   )
SERVICES, INC., a corporation, and       )
MARIO JACKSON, individually, and         )
in his official capacity,                )
                                         )
          Defendants.                    )

**ENTERED**

JAN  6 1997

### MEMORANDUM OPINION

This cause comes on to be heard on the defendants' Motion for Summary Judgment filed

by Quality of Life Health Services, Inc. and Mario Jackson on October 15, 1996.[1]


### BACKGROUND


The plaintiffs are three former employees of Quality of Life Health Services, Inc. (Quality)

who allege that Quality and its former Human Resource Manager, Mario Jackson (Jackson),

violated various federal and state laws.  Quality is a not-for-profit Alabama corporation that

operates numerous community health centers under the guidance of its CEO, Wayne Rowe

(Rowe).  Quality initially employed Jackson as its Human Resources Manager and later, in July

---

[1] The plaintiffs dismissed all Title VII claims against Mario Jackson in his individual capacity.  The
reference to him in his official capacity is tantamount to the claim against his employer.

39

1995, named him Director of Marketing.

The plaintiffs worked at the J.W. Stewart Neighborhood Health Center in Gadsden,
Alabama. Jackson worked at the Roberta Watts Neighborhood Health Clinic also in Gadsden.
According to the plaintiffs, Jackson repeatedly harassed them in varying degrees throughout their
employment at Quality despite the plaintiffs' protests that his conduct was unwelcome.[2] No
plaintiff, however, reported this alleged misconduct to anyone in higher management at Quality.
The plaintiffs contend, nevertheless, that Jackson's behavior was sufficiently severe or pervasive
to alter the conditions of their employment and create an abusive working environment. The
plaintiffs also contend that Jackson conditioned employment opportunities on their submission to
engage in sexual acts with him.[3] No plaintiff worked under Jackson's supervision either while he
was Human Resources Manager or Director of Marketing. There is no evidence that any of the
plaintiffs reported the alleged misconduct to their own direct immediate supervisors or to higher
management. Eventually, the plaintiffs either resigned or were fired by Quality.

The plaintiffs allege that Quality is liable because the company did not have an adequate

---

[2] Fran Miller alleges that Jackson immediately began to harass her at the initial interview. At that time,
Jackson asked Miller about her personal life and if she was happily married. Jackson allegedly told her that they "could
have some fun." Miller claims that the harassment continued after Quality hired her and included Jackson saying: "I
know you believe in extramarital affairs;" continually inquiring about her married life; telling her that she was attractive;
saying that "[h]e loved a woman with a nice round bottom;" constantly phoning her in the pediatric department where
she was not stationed and telling her "things she did not want to hear;" repeatedly asking her on dates; repeatedly asking
her to call him at home at night; making sexually explicit comments about her clothing and body; grabbing her behind
and insinuating that she would be fired unless she acquiesced in his advances.

Laura Miller alleges that Jackson: touched her arms and back; attempted to touch her sides, waist, and "more
intimate places;" making lewd statements and asking for sexual favors; and repeatedly insinuating that he could "do
things" for her and buy her "nice things" in return for sexual favors.

Apryl Jennings alleges that Jackson's harassment included: asking personal questions about her private affairs
and marital relationship; asking her to have an affair with him; boasting about his sexual abilities; telling her what he
could teach her sexually; making lewd statements; telling her what type of panties he liked and asking what type she
wore; and telling her about his past sexual encounters.

[3] The plaintiffs do not specify exact opportunities that were lost by their refusal to have sex with Jackson.
Instead, they claim that Jackson insinuated that he would confer benefits on them if they submitted to his requests.

sexual harassment policy and because the CEO Rowe condoned, acquiesced in, and ratified Jackson's conduct by engaging in similar conduct and failing to enforce the company's policy against such conduct. As indicated, the plaintiffs did not report the alleged conduct to Rowe or any other supervisor or manager. As support for their arguments, the plaintiffs submit, in part, a declaration and two affidavits from former employees of Quality who claim that Jackson treated them similarly.[4]

CONTENTS

I. TITLE VII CLAIMS

A. Hostile Environment Sexual Discrimination

The plaintiffs contend, in essence, that Jackson's alleged harassment was sufficiently severe and pervasive to alter the conditions of the plaintiffs' employment and create an abusive working environment. The plaintiffs claim that Quality is directly liable for Jackson's harassment because Jackson, they allege, as Human Resource Manager, possessed and exercised extensive control over the plaintiffs' working conditions, including the apparent authority to hire and fire employees. The plaintiffs further argue that Quality is indirectly liable for the hostile work environment because the company knew or should have known of the harassment and failed to

---

[4] This testimony does not directly support the plaintiffs' allegations because the affiants simply recite their own alleged experiences with Rowe and Jackson. One affiant testifies that she had a sexual relationship with Rowe and that Jackson harassed her. Another states that Jackson harassed her also. The declarator states that Rowe propositioned her and that she told Rowe about Jackson's alleged behavior. Rowe and Jackson, however, refute this testimony. The plaintiffs submit no evidence that Rowe acted similarly towards them as the affidavits suggest he did towards the affiants, nor that Rowe was told of any misconduct directed at them. The court does not decide whether any alleged relationships with Rowe were offensive or consensual.

3

take prompt remedial action. To support their claim of indirect liability, the plaintiffs argue that

Quality lacked a meaningful procedure to deal with complaints of harassment and that Quality

failed to respond appropriately to the complaints.

Quality, however, characterizes the incidents not as pervasive harassment but as

intermittent encounters. As such, Quality contends that the plaintiffs have failed to make out their

prima facie case. In support, Quality argues that an employer's liability for its employees' actions

is based on agency theory and that under such a theory the employer must have information

relating to its employee's alleged misconduct. Quality contends that the company had no such

knowledge and that proper established procedures were in place to handle claims confidentially.

## B. Quid Pro Quo Sexual Discrimination

The plaintiffs next contend that Jackson's requests for sex in return for job benefits was

quid pro quo sexual harassment. The plaintiffs argue the same theories of direct and indirect

liability against Quality as they assert in their hostile environment claim.

Quality contends, however, that Jackson is the sole alleged harasser and lacked authority

to hire and fire employees, lacked supervisory authority over the plaintiffs, and worked in a

different work site. Further, Quality claims that no evidence exists showing that anyone altered,

or threatened to alter, the plaintiffs' employment for their refusal to submit to sexual demands.

## C. Retaliation

At the outset, the court notes some confusion regarding which plaintiffs assert retaliation

claims.[5] In any event, the substance of the allegation is that Quality retaliated against Laura Miller

[5] In their Complaint, Fran and Laura Miller allege that they were terminated in retaliation for their opposition to Jackson's sexual harassment. In plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment footnote 1, however, the plaintiffs state that "The retaliation claim applies only to Laura Miller." As such, the court will

4

for opposing the harassment by treating her differently, subjecting her to harsher working conditions, threatening her with even harsher assignments, and eventually firing her.

Quality contends, however, that Laura Miller was legitimately and nondiscriminatorily fired for performing an unauthorized medical procedure and improperly requesting lab work on herself. Moreover, Quality argues that Laura Miller had previously resigned before Quality fired her. As such, Quality argues that the plaintiff fails to establish that she suffered an adverse employment action for engaging in statutorily protected conduct.

## II. STATE LAW CLAIMS

### A. Assault and Battery

The plaintiffs contend that Jackson touched them or attempted to touch them in a rude and insolent manner, thus assaulting and/or battering them. The plaintiffs further argue that Quality is liable for Jackson's alleged torts because Quality authorized and ratified Jackson's wrongful acts.

The defendants do not argue that Jackson could not be liable for these alleged torts. The defendants argue, instead, that Quality is not liable for the alleged acts because Jackson was not acting within the line and scope of his employment at the time and only incidentally had contact with the plaintiffs. Quality denies that the company ratified, confirmed, or adopted Jackson's wrongful conduct.

### B. Outrage

The plaintiffs contend that Jackson intentionally inflicted emotional distress upon the

---

only discuss the claim as it relates to Laura Miller.

5

plaintiffs by subjecting them to abusive, harmful, hurtful, vulgar touching and conduct throughout their employment. They further contend that Jackson's conduct created a "wholesale hostile environment" that existed without change for several years, and was "utterly intolerable in a civilized society populated with reasonable men and women." The plaintiffs argue that Quality is liable for the tort of outrage under the same agency theory they espouse for the assault and battery claims.

The defendants both deny that they intended to inflict emotional distress on the plaintiffs. Quality also argues that Alabama restricts the tort of outrage to extreme cases and that a court should not impose liability against an employer for the personal sexual transgressions of its employees. Quality also maintains that it did not ratify, confirm, or adopt the alleged wrongful acts of Jackson.

## C. Invasion of Privacy

The plaintiffs contend that Jackson intentionally intruded, physically or otherwise, upon their solitude, seclusion, private affairs, and concerns. Moreover, the plaintiffs claim that Wayne Rowe, Quality's CEO, engaged in similar conduct with other employees, which, consequently, renders Quality liable.

Jackson, however, denies that he intentionally invaded the plaintiffs' privacy. Further, Quality denies that it authorized, ratified, or condoned Jackson's actions.

## D. Negligent Hiring

The plaintiffs assert this claim against Quality and accuse the company of failing to properly investigate the prior work history of Jackson before employing him in a supervisory position. Quality contends, however, that the company made a diligent inquiry and received

6

uniformly positive reports on Jackson before employing him.

### E. Malicious Retention

The plaintiffs also assert this claim against Quality. They contend that the company maliciously and/or wantonly retained Jackson after receiving notice of Jackson's sexual harassment and, subsequently, failed or refused to correct Jackson's misconduct.

Quality denies that a claim for malicious retention exists under Alabama law. Quality further contends, however, that the company received no notice of the alleged harassment and, thus, was not wanton in failing to act.

## ANALYSIS

### I. TITLE VII CLAIMS

Title VII creates liability when an employer "discriminate[s] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. §2000e-2(a)(1); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63, 106 S. Ct. 2399, 2405-06, 91 L. Ed.2d 49 (1986).

#### A. Hostile Environment Sexual Discrimination

To establish a prima facie case of hostile environment sexual harassment, an employer must prove the following: (1) that the employer belongs to a protected group, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, (4) that the harassment complained of affected a term, condition, or privilege of employment in that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Sparks v. Pilot Freight

7

Carriers, Inc., 830 F.2d 1554, 1557 (11th Cir. 1987). To decide whether a work environment is abusive or hostile, the totality of the circumstances must be considered. Faragher v. City of Boca Raton, 76 F.3d 1155, 1162 (11th Cir. 1996). "Relevant circumstances include: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 76 F.3d at 1162 (quoting Harris v. Forklift Systems, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993)).

Title VII plaintiffs who seek to hold their employer liable for hostile environment sexual harassment must generally show that the employer is indirectly liable for the supervisor or co-worker's conduct under the theory of respondeat superior. In rare cases, the employer may be directly liable. Consequently, the plaintiff may show either that: (1) her employer knew or should have known of the harassment in question and failed to take prompt remedial action,[6] or (2) the harasser acted as the employer's agent. Faragher v. City of Boca Raton, 76 F.3d 1155 (11th Cir. 1996).[7] Only in an exceptional case, however, will the harasser act as the employer's agent in creating a hostile work environment. Faragher, 76 F.3d at 1164.[8]

The plaintiffs have established a prima facie case of hostile environment sexual

---

[6] The employee can demonstrate the employer's knowledge of the harassment by: (1) showing that she complained of the harassment to higher management, or (2) showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge. Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir. 1982).

[7] "Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no quid pro quo exists. The supervisor does not act as the company; the supervisor acts outside 'the scope of actual or apparent authority to hire, fire, discipline, or promote.'" Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir. 1989).

[8] In so-called "direct liability," several nondispositive factors are relevant to whether a harasser is acting as the employer's agent in creating a hostile work environment: the supervisor's direct authority over the plaintiff, the overall structure of the workplace, and the relative positions of the parties. Faragher, 76 F.3d at 1165.

discrimination under Title VII. First, all plaintiffs are female and thus belong to a protected group. Second, the plaintiffs were arguably subject to unwelcome sexual harassment. This element does not require the plaintiff to have actively expressed her disapproval towards the unwelcome conduct. The conduct instead must be "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982). The evidence indicates that Jackson's conduct was, at a minimum, unwelcome. Third, the harassment complained of was based on sex. Traditionally this element is a simple matter for a plaintiff to prove because the law requires only that the plaintiff prove that but for her sex, she would not have been subjected to sexual harassment. Henson, 682 F.2d at 904. The evidence shows that Jackson only directed his sexual overtures, if at all, towards female employees. No evidence exists showing that Jackson treated male employees similarly. Fourth, the harassment complained of affected a "term, condition, or privilege" of the plaintiffs' employment. Each plaintiff recites a common theme of behavior by Jackson that extends beyond mere annoyance. The evidence, if believed, tends to establish that Jackson subjected the plaintiffs to frequent and severe harassment. Although many of the plaintiffs' allegations arguably could be characterized as merely offensive, other allegations show Jackson's conduct to be physically threatening and humiliating. Employees need not be subjected to questions and comments about the sexual nature of their attire or to touching by their supervisors. Further, there are the allegations that Jackson continually requested sexual favors from the plaintiffs.

A troubling aspect of the plaintiffs' case, however, is that neither of them reported this alleged egregious misconduct to their immediate supervisor nor to anyone in Quality's higher

9

management. The plaintiffs argue that this failure was because of an inadequately defined harassment policy. Regardless, the evidence shows that Quality maintained a policy against harassment.[9] The parties dispute, however, whether the plaintiffs knew of the policy and their available complaint routes.

Title VII plaintiffs must also establish what is sometimes called a fifth element to their prima facie case - the employer's liability for its employee's misconduct. See Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1557 (11th Cir. 1987). The plaintiffs contend that Quality is liable both directly and indirectly for the allegedly hostile working environment created by Jackson. Consequently, the court must address two distinct issues. The first issue is whether Jackson, as Human Resource Manager, was acting within the scope of his actual or apparent authority to hire, fire, discipline, or promote when harassing the plaintiffs - so called direct liability. The uncontroverted evidence shows that Jackson possessed no actual supervisory authority.[10] The question then follows whether Jackson had apparent supervisory authority. Plaintiffs contend that Jackson had apparent authority because he participated in their initial interviews and had the title of Human Resource Manager. Consequently, the plaintiffs contend that they believed that Jackson had supervisory authority. The court concludes otherwise. Mere perception, without basis, is insufficient upon which to ground direct liability against Quality for

_____

[9] Quality's Personnel Policies and Procedures Manual states in relevant part under the heading Employee Conduct and Requirements: "Refrain from any and all conduct designed, intended or calculated to inflict or impose upon another employee unwanted personal, social or sexual contact, verbal or physical. . . . . Refrain from all words and conduct directed to another employee which such other employee deems objectionable and/or offensive . . . ." The manual also states: "When knowledgeable, report to the supervisor or the CEO all unusual situations or conditions including misuse of equipment and materials, abuse of time, theft inappropriate possession or use of weapons or firearms, violation of confidentiality code or other misconduct."

[10] A summary of the Human Resource Manager's job description states, in part, "Supervisory responsibilities: no direct responsibilities. However, this position must elicit the cooperation of every manager in achieving effective results with personnel." Further, no evidence exists that Jackson, in fact, exercised any supervisory authority.

10

Jackson's alleged behavior. The evidence tends to show that Jackson had limited contact with the plaintiffs, worked predominantly in a separate facility, and, in fact, did not supervise the plaintiffs' work.[11] Moreover, the plaintiffs fail to proffer evidence of any instances where Jackson, in fact, supervised them. The court concludes, therefore, that Jackson was not acting within the scope of his employment when he allegedly harassed the plaintiffs but rather was motivated, if at all, by personal desires.

The second issue, then, is whether Quality knew or should have known of the harassment and failed to take prompt remedial action - so-called indirect liability. The record reveals that neither of the plaintiffs complained to higher management or to their own immediate supervisors.. Further, there is no evidence that anyone in higher management knew of Jackson's alleged conduct directed at the plaintiffs. Consequently, Quality did not actually know of the harassment. The court must now decide whether Quality had constructive knowledge in that the company should have known of Jackson's conduct. The Eleventh Circuit recently reiterated that "a court must evaluate the totality of the circumstances both in determining whether the work environment was abusive and in determining whether the conduct was pervasive enough to put the employer on notice." Faragher v. City of Boca Raton, 76 F.3d 1155, 1167 (11th Cir. 1996). An important distinction remains, however, between the question of an employer's notice and the question of the environment's abusiveness. Faragher, 76 F.3d at 1167. A district court clearly errs in finding that the employer's knowledge may be inferred solely from the fact that the conduct was pervasive enough to create an abusive work environment. Id. This court cannot conclude,

---

[11] Jackson's job description states that he was responsible for "implementing board policies in managing personnel, coordinates staff orientation and training, and directs the overall personnel program."

11

therefore, that Quality should have known of Jackson's alleged behavior simply because the court has concluded that the plaintiffs worked in a hostile environment. The court concludes that the alleged conduct was not so pervasive that Quality should have known about it. The alleged acts were all isolated and discrete incidences in that no one, other than the plaintiffs, verify their existence as to the plaintiffs. The plaintiffs, in fact, testified that no one saw Jackson treat them in a harassing manner. These statements do not mean that Jackson did not act as accused but instead shows the lack of a reason for Quality to have known.[12] The plaintiff attempts to establish the pervasiveness of Jackson's conduct by submitting testimony from three other former employees who lodged similar allegations against Jackson and Rowe. This testimony is relevant to show that Jackson, in fact, acted as accused and, to that extent, corroborates the plaintiffs' testimony. The relevance to Quality's constructive knowledge, especially as the testimony relates to these plaintiffs, is far less substantial.

The court concludes that Quality is not liable for Jackson's alleged conduct because such conduct was discrete and isolated in the overall scheme of the workplace and committed by an individual defendant. This fact, when taken with the overall structure of the employer,[13] strongly

---

[12] The plaintiffs devote considerable space in their brief to a quote from Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486 (M.D. Fla. 1991) stating that an employer cannot stand on an "ostrich defense" - that the employer lacked knowledge of the harassment because, like an ostrich, the employer elected to bury its head in the sand rather than learn more about the conditions to which female employees were subjected. The court agrees with the statement in general but stresses that quotations are only truly relevant when taken in the context of the facts. In Robinson, the court took over ten pages to detail the extreme and severe facts supporting the plaintiffs allegations of harassment. Relevant to this courts analysis is that in Robinson the plaintiff herself lodged numerous complaints with supervisors and management, the harassment existed throughout the expansive company, the plaintiff's plight was widely known, and the employer was admittedly notified and failed to take action. None of these factors appears to exist under the present facts. The court also notes that in Robinson the harassment was largely in the form of abundant nude pictures widely displayed in prominent areas, graphic adult magazines present in the workplace, and vulgar comments from countless other employees directed at the plaintiff. Again, such widespread behavior is not present under these facts.

[13] Quality has seven clinical sites and approximately 135 employees.

12

weighs against constructive knowledge.[14] The sexually harassing behaviors described in the record are not so pervasive to have necessarily attracted the notice of Quality's management. It is not asking too much to require that a person allegedly being harassed report the harassment to higher management or, at least, to her immediate supervisor. It is not sufficient for an employee to wait until disciplinary action has been taken against her and then, for the first time, complain of alleged improper conduct. Any reasonable employee would know that she had a right to complain. Accordingly, summary judgment will be granted on this claim.[15]

## B. Quid Pro Quo Sexual Discrimination

Quid pro quo sexual harassment occurs when an employer alters an employee's job conditions because of the employee's refusal to submit to sexual demands. Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311 (11th Cir. 1989). To establish a prima facie case of quid pro quo sexual harassment against an employer, the employee must prove: (1) that the employer belongs to a protected group, (2) that the employee was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, and (4) that the employee's reaction to the harassment affected tangible aspects of the employee's compensation, or terms, conditions, or privileges of employment. Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1564 (11th Cir. 1987).

In a quid pro quo case, the corporate defendant is strictly liable for the supervisor's harassment. Steele, 867 F.2d at 1316 (11th Cir. 1989). Strict liability arises because "when a

---

[14] The court does not imply that more than one harasser must act to impart constructive knowledge to the employer.

[15] The defendant filed a Motion to Strike Plaintiffs' Affidavits in Opposition to Defendants' Motion for Summary Judgment. The court need not address the merits of the Motion to Strike for reasons that will be apparent. Consequently, the Motion will be deemed moot.

13

supervisor requires sexual favors as a quid pro quo for job benefits, the supervisor, by definition, acts as the company." Id.

> In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the quid pro quo. In that case the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He acts within the scope of his actual or apparent authority to 'hire, fire, discipline or promote.' Because the supervisor is acting within at least the apparent scope of the authority entrusted to him by the employer when he makes employment decisions, his conduct can fairly be imputed to the source of his authority.

Henson v. City of Dundee, 682 F.2d 897, 910 (11th Cir. 1982) (quoting Miller v. Bank of America, 600 F.2d 211, 213 (9th Cir. 1979).

To begin its analysis, the court will grant the defendant's motion as to Apryl Jennings. Jennings failed to allege or to submit any evidence, either by deposition or affidavit, that reasonably tends to show quid pro quo harassment. Jennings' testimony merely reflects one incident of harassment that, if proved, might fall under the heading of hostile environment sexual harassment.

The court will also grant the defendants' motion for summary judgment as to the other two plaintiffs' claims. The claims fail, however, because the plaintiffs do not show that Jackson made any job benefits contingent upon submission to the alleged sexual harassment or that he was their supervisor with authority to do so.. In her affidavit, Fran Miller states that "Jackson . . . suggested to me that if I cooperated with him, that we could have some fun. I took this to mean that if I would go out with him or to bed with him, that I would be entitled to beneficial treatment." Laura Miller states that "[Jackson] repeatedly told me that he could do things for me and buy me nice things. I took this to mean that he would do certain things for me or buy certain

14

things for me in return for sexual favors from me." Neither of these vague statements reasonably relates to the plaintiffs retaining their current positions nor gaining other job benefits - although they made be read as inferring possible nonemployment benefits.

The material basis of a quid pro quo claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse repercussions will follow from the employee's refusal to submit to the conduct. In other words, the critical element of a quid pro quo claim is the exchange of job benefits for the toleration of the sexual harassment. The issue is not whether any action rises to the level of a tangible detriment but whether the harasser has tied tangible job benefits to the acceptance or rejection of sexual proposals. Under the given facts, the evidence is insufficient to show that Jackson tied any tangible job benefits to the acceptance or rejection of his alleged proposals, or that he had the authority to do so. Accordingly, summary judgment will be granted as to all plaintiffs' quid pro quo claims.

## C. Retaliation

Title VII prohibits an employer from discriminating against an employee because the employee has opposed any practice made an unlawful employment practice, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. See 42 U.S.C. §2000e-3(a). To state a prima facie case of retaliation under the first part of this standard, the so-called "opposition clause," the employee must establish: (1) that she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding, (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation, and (3) that there is a causal connection

15

between the protected activity and the adverse employment action. Morgan v. City of Jasper, 959

F.2d 1542, 1547 (11th Cir. 1992). In analyzing such claims:

> The first element is established if the plaintiff can show that he opposed an
> unlawful employment practice which he reasonably believed had occurred.
> Evidence that the protected activity and the adverse employment action were not
> totally unrelated satisfies the third prong of proof of a prima facie case. Where a
> plaintiff has failed to produce direct evidence of discrimination, a defendant
> employer may rebut the prima facie case of retaliation by articulating legitimate
> reasons for the employment action, whereupon the plaintiff must prove by a
> preponderance of the evidence that the employer's articulated reasons constitute a
> pretext for discrimination. In rebutting the plaintiff's prima facie case, a defendant
> employer must only produce credible evidence supporting its legitimate reasons.
> The employer does not bear the burden of persuasion. That burden remains with
> the plaintiff and is carried with evidence that the plaintiff's engagement in
> protected activity was a significant factor in the employer's decision.

Bigge v. Albertsons, Inc., 894 F.2d 1497, 1501-02 (11th Cir. 1990) (citations omitted).

Quality apparently does not dispute that Laura Miller (Miller) has satisfied her initial

burden. Quality contends instead that the company fired Miller for a legitimate, non-retaliatory

reason. Specifically, Quality maintains that Miller violated company policy by performing

unauthorized laboratory procedures on herself. In the company's version of the facts, a medical

records official attempted to file documents to receive payment for lab-work performed on Laura

Miller by herself. The paperwork that originally ordered the lab-work was not signed by a doctor

or medical provider authorized to requisition such work. Subsequently, the department physician

refused to approve the paperwork because the physician did not initially authorize the work. The

medical records official sent a memo to the medical director, the operations director, and Wayne

Rowe detailing the facts. Thereafter, Miller's immediate supervisor (not Jackson) recommended

to Rowe that Miller be fired and, in fact, she was.

The company's proffered reason is legally sufficient to rebut the presumption of retaliatory

16

discharge. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981). As this case is based on circumstantial evidence, the burden now shifts to Miller to either: (1) persuade the court that it was more likely that a discriminatory reason rather than the proffered reason motivated Quality to fire her; or (2) show that Quality's proffered explanation was unbelievable, i.e., that its reason was a pretext. See Morgan v. City of Jasper, 959 F.2d 1542, 1548 (11th Cir. 1992). Miller satisfies neither alternative because she neither submits evidence to show that a retaliatory reason motivated Quality nor that Quality's stated reason was pretextual. As such, Miller fails to carry her burden of proof. In any event, Quality has overwhelmingly shown that the company fired Miller for performing unauthorized lab procedures. This action prompted this and other claims. Accordingly, summary judgment will be granted as to this claim.

## II. STATE LAW CLAIMS

Since the court will dismiss all federal claims, it will not accept jurisdiction of the state law claims which are only supplemental. They will be dismissed without prejudice.

17

This ___ day of January, 1997.

Robert B. Propst
Senior United States District Judge

18